## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|                          |   |                             |
|--------------------------|---|-----------------------------|
| DANIEL CORNELIUS,        | : | Civil Action No. 14-1594(JBS) |
|             Petitioner,  | : |                             |
|                          | : |                             |
|         v.               | : | **OPINION**                 |
|                          | : |                             |
| STEPHEN D'ILIO, *et al.*,| : |                             |
|                          | : |                             |
|             Respondents. | : |                             |
|                          | : |                             |

---

APPEARANCES:

Daniel Cornelius
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625
        Petitioner, pro se

Elliott J. Almanza
Assistant Prosecutor
Atlantic County Prosecutor's Office
4997 Unami Blvd.
P.O. Box 2002
Mays Landing, NJ 08330
        On behalf of Respondents.

**Simandle, United States District Judge**

## I.    INTRODUCTION

Petitioner Daniel Cornelius ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a pro se Petition (ECF No. 1) for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons explained in this Opinion, the Court will deny the Petition and will also deny a certificate of appealability.

## II. FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division on Petitioner's direct appeal.[1] (ECF No. 8-23 at 2-3.)

> On September 22, 2001, around 10:30 p.m., seventeen-year old Robert (Bobby) Williams agreed to walk Yakita Foreman and her two-year old son to her home in Atlantic City. On the way, the group decided to cut through the Shore Terrace Housing Complex, also known as the Six Bedrooms Project, and stopped at the playground for a few minutes to allow Foreman's son to play.
>
> As the group was passing the community center, a man dressed in black boots, black jeans, a hooded sweatshirt with a scarf over his face asked Williams to come over. He had a gun and directed Williams to get down on the ground, but Williams refused. The perpetrator then turned Williams around and forced him to the doors of the community center and told him to empty everything out of his pockets. When Williams told him that he had already done so, the man hit Williams on the right side of his head with the gun. Williams turned around and punched the man, knocking him to the ground. Without rising, the man shot Williams. The shooter ran off first in one direction and then he ran back, passing Foreman a second time.
>
> A 911 call, traced to the home of Cheryl Royster, reported the shooting. Police went to Royster's home, where they learned that Royster's son, Ronald Harris, had witnessed the shooting. Harris told police that he had been outside in the courtyard playing with his friends, Roger, Latel Allen, Todd Dorn, and

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1), unless rebutted by clear and convincing evidence.

others and that he recognized the shooter as "Shorty."

Vaughn Blakely approached another investigator and identified defendant as the shooter. The initial statement was not recorded because Blakely was obviously drunk or high at the time. However, a few days later police re-interviewed Blakely and a sworn, recorded statement, consistent with his earlier statement was made. Based partly on this information, police decided to include defendant's photograph in a sequential photo array. This array was shown to Foreman, Allen and Harris. All of them identified defendant as the man who shot and killed Williams.

The officers also interviewed Abdul Muhammad, a resident of Six Bedrooms. On September 25, 2001, Muhammad gave a sworn statement in which he identified defendant as the shooter.

During the course of the investigation, the Atlantic City police were unable to locate defendant. In January 2002, Keith Bell, an inmate at the Atlantic County Jail, sent prosecutors a letter, stating that he had information concerning the possible whereabouts of the defendant. On January 30, 2002, Bell gave a recorded statement to detectives of the Major Crime Squad, in hopes of obtaining a deal from the prosecutor's office. In his statement, Bell said that defendant did not intend to shoot Williams, but that he was attempting to rob him for drug money. Defendant was ultimately apprehended in Baltimore, Maryland, and brought to trial.

At the trial, Foreman, Harris, Allen, and Dorn all gave eyewitness testimony concerning the shooting and again identified defendant as the shooter. Allen and Dorn both made in-court identifications of defendant. Bell, despite his previous statement to police, testified that he had no information regarding the shooting and asserted that his earlier statement to the police was a lie. Muhammad

> also testified that his earlier statements to
> police, that defendant had shot Williams, were
> lies.  Vaughn Blakeley was not called to
> testify by either side.

State v. Cornelius, Indictment No. 01-12-2508, 2007 WL 1687510 at *1-2 (N.J. Super. Ct. App. Div. June 13, 2007).

Petitioner was convicted of felony murder, first degree robbery, second degree possession of a firearm for an unlawful purpose, third degree unlawful possession of a weapon, fourth degree aggravated assault, third degree hindering prosecution, fourth degree tampering with physical evidence and second degree possession of a weapon by a convicted person.  Id. at *1. Petitioner was sentenced for the felony murder to a term of sixty-three and three-quarter years mandatory minimum subject to the No Early Release Act.  Id.  Petitioner was also sentenced to a consecutive ten-year extended term with a three-year mandatory minimum for hindering prosecution and a concurrent five-year term for the offense of possession of a firearm without a permit.  Id. His conviction for second degree possession of a weapon by a convicted person was dismissed and the remaining counts were merged.

The Appellate Division affirmed Petitioner's conviction.  Id. at *5.  The Supreme Court denied certification on February 3, 2010. State v. Cornelius, 192 N.J. 479 (2007).

Petitioner then filed a petition for post-conviction relief ("PCR") on December 10, 2007, that was denied following oral arguments from the parties. (ECF No. 8-29, 8-32.) Judge Kyran Connor adjudicated the PCR matter. On May 15, 2013, the Appellate Division affirmed the PCR Court's decision. State v. Cornelius, Indictment No. 01-12-2508, 2013 WL 2169666 (N.J. Super. Ct. App. Div. May 25, 2013).

On November 14, 2014, the New Jersey Supreme Court denied Petitioner's petition for certification. State v. Cornelius, 932 A.2d 29 (N.J. 2007). Petitioner filed the instant petition for habeas relief under § 2254 on May 23, 2014. (ECF No. 3.) Respondents filed their full Answer on June 12, 2015. (ECF No. 8.) The matter is fully briefed and ready for disposition.

**III. STANDARD OF REVIEW**

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. See Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. See Renico v. Lett, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Parker v. Matthews, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision. White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting

6

<u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000))). If a decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. <u>Cullen v. Pinholster</u>, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see</u> <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State."

28 U.S.C. 2254(b)(1)(A). To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court." Leyva v. Williams, 504 F.3d 357, 365 (3d. Cir. 2007) (citing Stevens v. Delaware Corr. Ctr., 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" Id. (citing United States v. Bendolph, 409 F.3d 155, 173 (3d Cir. 2005) (quoting Duckworth v. Serrano, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. Johnson v. Pinchak, 392 F.3d 551, 556 (3d. Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." Leyva, 504 F.3d at 365-66 (citing Nara v. Frank, 488 F.3d 187, 196, 199 (3d Cir. 2007); see also Gray v. Netherland, 518 U.S. 152 (1996), and Coleman v. Thompson, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." Leyva, 504 F.3d at 366 (citing Lines v. Larkins, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can

nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). See Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## IV. ANALYSIS

The Petition raises twelve grounds for relief, two of which assert error by the trial judge regarding admission of hearsay and jury instructions, three of which allege prosecutorial misconduct, and seven of which allege ineffective assistance of trial, appellate and or PCR counsel. For the reasons explained in this section, the Court finds that Petitioner's claims do not warrant federal habeas relief.

### A. Trial Court's Erroneous Admission of Hearsay Evidence

Petitioner asserts that the trial court's admission of prejudicial hearsay evidence was in violation of his Sixth Amendment Right of Confrontation as well as his Fourteenth Amendment rights to due process and a fair trial. (ECF No. 3 at 11.) The prejudicial statements that form the basis of this claim were those made by Vaughn Blakely to investigators shortly after the shooting. (Id. at 12.)

Petitioner previously raised this claim on direct appeal. (ECF No. 19 at 27-32.) The Appellate Division agreed that the statements were inadmissible hearsay, but were harmless nonetheless because the trial evidence overwhelmingly proved Petitioner's guilt. State v. Cornelius, Indictment No. 01-12-2508, 2007 WL 1687510 at *3 (N.J. Super. Ct. App. Div. June 13, 2007).

Petitioner argues that Vaughn Blakely's out of court statements were improperly admitted when a police investigator testifying for the state partially referenced statements taken from Blakely shortly after the shooting. (ECF No. 12-13.) Immediately after the shooting, Blakely, an acquaintance of the Petitioner who was observed to be drunk or high, identified Petitioner as the assailant but was not asked to provide a formal statement at that time. Cornelius, 2007 WL 1687510 at *2. A few days later Blakely provided a sworn, recorded statement that was consistent with the prior statement. Id.

At the trial, Detective Michael Graham of the Atlantic City Police Department testified that Blakely approached him as he was canvassing the Six Bedrooms Apartments shortly after the shooting. (ECF No. 8-6 at 32.) Blakely offered information about the shooting after the detective informed him that Williams succumbed to his injuries. (Id. at 33.) Blakely agreed to accompany the detectives to their office where he was interviewed. Detective

Graham testified that during the course of the interview, Blakely provided the identity of a person involved in the shooting, however, the interviewing officials decided against taking a recorded statement from Blakely because of his obvious intoxication. (Id.) A few days later, Blakely provided a recorded statement that was consistent with his prior statement. (Id. at 34.) Graham further testified that Blakely also identified the type of weapon used by Robert Williams' assailant. (Id. at 35.) Graham never testified about whom it was that Blakely identified as the shooter, only that Blakely did in fact identify a shooter. Moreover, Graham testified that the Petitioner was ultimately identified as a suspect after witness interviews were conducted not only by himself but also by his fellow detectives who were assigned to the case. (Id. at 42.) Based on their investigation, the detectives composed a photographic array that included Petitioner's photograph, subsequently shown to multiple witnesses. (Id. at 42-43.)

The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The standard for determining Confrontation Clause violations in criminal trial proceedings was outlined in the United States Supreme Court's opinion in Crawford v. Washington, 541 U.S. 36 (2004). In

<u>Crawford</u>, the Supreme Court held that the prosecution could not use the police statement of a wife against her defendant husband at trial, where the wife was unavailable as a witness due to the spousal privilege. Admission of the statement violated the Confrontation Clause. <u>Id.</u> at 68-69.

The circumstances surrounding both of Vaughn Blakely's relevant statements to law enforcement arguably qualify as testimonial. <u>See</u> <u>United States v. Hendricks</u>, 395 F.3d 173, 181 (3d Cir. 2005) (quoting <u>Crawford</u>, 541 U.S. at 51) ("A witness 'who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not'.")) Moreover, the Petitioner did not have an opportunity to cross-examine Blakely as the Sixth Amendment demands. <u>Crawford</u>, 541 U.S. at 68.

The Appellate Division agreed with Petitioner's contention that Officer Graham's impermissible hearsay testimony about Blakely's statement should not have been admitted into evidence. <u>Cornelius</u>, 2007 WL 1687510 at *3. Nonetheless, it ruled that in light of the "overwhelming evidence" of Petitioner's guilt, admission of the statement was harmless. <u>Id.</u>

> "[F]actors in assessing whether the erroneous admission of testimonial evidence in violation of the Confrontation Clause was harmless to the defendant, includ[e] the importance of the testimony to the Government's case, the cumulative nature of the evidence, the existence of corroborating

> evidence, the extent of cross-examination
> allowed in the case, and the strength of the
> Government's case as a whole."

United States v. Jimenez, 513 F.3d 62, 78 (3d Cir. 2008) (citations omitted). The record reflects that the state presented the testimony of numerous eyewitnesses to the shooting, some of whom were already familiar with Petitioner. Therefore, notwithstanding Blakely's statements that may have aided the early investigatory stage of the case, Detective Graham's reference to those statements was not the linchpin of the state's evidence.

Further, the state's case included substantial evidence supporting the jury's guilty verdict including testimony from four eyewitnesses.

For these reasons, the Appellate Division's determination that Detective Graham's wrongfully permitted statements were not injurious to Petitioner's case was not an unreasonable application of established federal law. See Fry v. Pliler, 551 U.S. 112, 121 (2007)(held that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the substantial and injurious effect standard . . . "). Therefore, the Court denies relief on this ground.

B.   Trial Court's Jury Instructions

Petitioner also claims that the inadequate jury instructions were in contravention of his right to a fair trial and due process of law. (ECF No. 3 at 18.) While Petitioner does not provide any

supporting facts or arguments in the instant petition, he directs the Court's attention to his direct appeal filings where he initially raised this claim.

In his direct appeal, Petitioner argued that the instructions to the jury were inadequate because he was "convicted of robbery and felony murder on a theory of an attempted rather than a completed theft . . ." yet jury instructions that included the attempt statute were not provided. (ECF No. 8-19 at 20.) Respondents argued then as they do now, that the Petitioner's "all or nothing" theory of defense did not necessitate such an instruction at trial, and Petitioner is now precluded from asserting that the failure to provide the instruction was erroneous. (ECF. No. 8 at 23.) The Appellate Division concurred with Respondents' argument, holding that Petitioner's trial defense was misidentification and the question of whether a robbery actually occurred was never at issue and, as such, the trial court's exclusion of an attempted robbery instruction was not erroneous. Cornelius, 2007 WL 1687510 at *3.

The trial court gave the following instruction with respect to robbery:

> A person is guilty of robbery while armed if
> in the course of committing a theft he
> knowingly inflicts bodily injury or uses force
> upon another. In order for you to find the
> defendant guilty of armed robbery, the State
> is required to prove the following elements
> beyond a reasonable doubt: one, that the

defendant was in the course of committing a theft; two, that while in the course of committing that theft the defendant knowingly inflicted bodily injury or used force upon another, in this case allegedly Robert or Bobby Williams, and then finally, that at time of the robbery the defendant was armed with or used or threatened the immediate use of a deadly weapon.

Now, let's go over those three elements. As I have said, the State must prove beyond a reasonable doubt that the defendant was in the course of committing a theft. In this connection you are advised that an act is considered to be "in the course of committing a theft" if it occurs in an attempt to commit the theft, during the commission of the theft itself, or in an immediate flight after the attempt or commission. Theft is defined as the unlawful taking or exercise of unlawful control over property of another with purpose to deprive him thereof. I have used that phrase "with purpose"; you may hear me use that phrase or the word "purposely" again.

I'll now explain what it means. A person acts purposely with respect to the nature of his conduct or a result thereof, if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. Terms such as with surprise, design, with design, or equivalent terms all have the same meaning in the law. So purpose of course is a state of mind that cannot be seen and can only be determined by [illegible], from conduct words or acts.

Therefore, as I advised you earlier, it is not necessary that the State produce witnesses to testify that a defendant said that he purposely did something. His purpose may be gathered or inferred from his acts and his conduct, from all that he said and did at the

15

particular time and place and from all of the surrounding circumstances reflected in the testimony and adduced at trial. In addition to proving beyond a reasonable doubt that this defendant was in the course of committing a theft, the State must also prove beyond a reasonable doubt that while in the course of committing that theft the defendant knowingly inflicted bodily injury or used force upon Robert – Bobby Williams.

Now, you'll note a slightly different state of mind there. Knowingly inflicted bodily injury. A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature or that such circumstances exist, or if he is aware of a high probability of their existence. A person acts knowingly with respect to the result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. Knowledge is a condition of the mind that cannot be seen and that can be determined only by inferences, from conduct, words or acts.

It is not necessary that the State produce witnesses to testify that an accused said that he had a certain state of mind when he engaged in a particular act. And this, the alleged armed robbery, it is within your power to find that such proof has been furnished from the nature of the defendant's acts and conduct, from all that is said and done in the particular time and place and from all of the surrounding circumstances.

Now, that phrase "bodily injury" means physical pain, illness or any impairment of physical condition. "Force" means an amount of physical power or strength used against the victim and not simply against the victim's property. The force need not entail pain or bodily harm and not leave any mark. Although in this case obviously the State is alleging that the force used was that of killing the victim. Nevertheless, the force must be

greater than that necessary merely to snatch the object from the victim's grasp or the victim's person and the force must be directed against the victim not merely the victim's property.

You may recall there was other evidence introduced by the State that allegedly suggested that that [sic] was some force used even without the gun by the defendant upon Mr. Williams, causing Mr. Williams to react, and then allegedly to strike the defendant at which point is when the alleged shooting did occur.

Now, a section of our statute provides that robbery becomes armed robbery if the robber is armed with or uses or threatened the immediate use of a deadly weapon. In this case it is alleged that the defendant was armed with a deadly weapon and, in fact, it is alleged that he used it while in the course of committing the robbery.

In order for you to determine the answer to these questions, you must understand the meaning of course of the term "deadly weapon"; a deadly weapon is any firearm or other weapon, device instrument, material or substance whether animate or inanimate and which in the manner it is used or intended to be used is known to be capable of producing death or serious bodily injury or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury.

In this case, of course, the State alleges that the defendant was armed with a handgun. You must determine if this object qualifies as a deadly weapon and if the State has proven beyond a reasonable doubt that the defendant used it in the course of committing this robbery.

Serious bodily injury means bodily injury which creates a substantial risk of death or

which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. In this case, of course, the State is alleging the death occurred as a result of the actions of the defendant. The defense has argued that the State has not proved that this defendant was the one who did anything to rob Robert or Bobby Williams and they have not proven that beyond a reasonable doubt.

If you find that the State has proven beyond a reasonable doubt that the defendant committed the crime of robbery and was armed with a deadly weapon or used or threatened the immediate use of it, then you must find at the time of the commission of the robbery – then you must finds [sic] the defendant guilty of robbery while armed. But if you find that the State has not proven beyond a reasonable doubt any element of armed robbery as I've defined it to you or as to whether this defendant was in fact the one who committed the crimes on September 22nd of 2001, then you must find him not guilty of this charge. Note that the robbery does not or theft does not have to be completed and that an attempt will suffice. It does not have to be a completed act where actual receipt of what sought to be robbed is made by the defendant.

(ECF No. 8-10 at 63-65.)

The trial record reflects that there were no objections to the jury instruction on robbery. Furthermore, neither party requested a jury instruction for any lesser included offense of robbery including attempted robbery, theft or attempted theft. (ECF No. 8-9 at 35-65.) Petitioner argues that the trial court should have provided a jury instruction on "attempt" because of the mental state requisite under New Jersey's attempt statute. (ECF No. 8-

19 at 24.)  New Jersey's attempt statute provides, in part, the following:

> a. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
>
> (1) Purposely engages in conduct which would constitute the crime if the attendant circumstances were as a reasonable person would believe them to be;
> (2) When causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing such result without further conduct on his part; or
> (3) Purposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
> b. Conduct which may be held substantial step under subsection a. (3). Conduct shall not be held to constitute a substantial step under subsection a.(3) of this section unless it is strongly corroborative of the actor's criminal purpose.

N.J. Stat. Ann. § 2C:5-1.

Moreover, under New Jersey law, an instruction regarding the law of attempt is a required component of a robbery instruction when the state's theory of the case is that the defendant committed a robbery by using force in the course of attempting to commit a theft although there was no evidence of defendant obtaining anything from his victim.  <u>State v. Lamar</u>, Indictment No. 07-08-1934, 2011 WL 744640, at *2 (N.J. Super. Ct. App. Div. Mar. 4,

2011) (citing State v. Gonzalez, 318 N.J. Super. 527, 532-37 (App. Div.), certif. denied, 161 N.J. 148 (1999)).

In an action seeking relief under § 2254 alleging an erroneous jury instruction, the federal court is not concerned with whether the instruction was erroneous under state law but instead whether the instruction rises to a level of so infecting the fairness of the trial that it violates due process. Thus, as explained in Porter v. Brown:

> [Q]uestions relating to jury charges are normally matters of state law and not cognizable in federal habeas review. See Engle v. Isaac, 456 U.S. 107 (1982); Henderson v. Kibbe, 431 U.S. 145 (1977); Zettlemoyer v. Fulcomer, 923 F.2d 284, 309 (3d Cir.), cert. denied, 502 U.S. 902 (1991); Grecco v. O'Lone, 661 F.Supp. 408, 412 (D.N.J. 1987). Only where the jury instruction, as given, is "so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie." Id. "The fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." Estelle, 502 U.S. at 71-72. Rather, the district court must consider " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' "Henderson, 431 U.S. at 154 (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)). Moreover, "the burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state's court judgment is even greater than the showing required to establish plain error on direct appeal," id., and challenge to his jury instructions based on omission of a "lesser-

> included offense" are subject to even more
> rigid scrutiny.

Porter v. Brown, No. 04-4415, 2006 WL 2640624, at *8 (D.N.J. Sept. 12, 2006).

Here, the state did not present evidence of Petitioner actually obtaining anything of the decedent's. Thus, under New Jersey law, the trial court may have been required to provide an instruction regarding the elements of attempt to commit an offense. Id. Additionally, New Jersey's jury instructions on robbery reflect that a definition of attempt should be provided if the robbery occurs in an attempt to commit the theft. Model Jury Charge (Criminal)- Robbery in the First Degree N.J. Stat. Ann. 2C:2-(b)(1). `

Nonetheless, to the extent that Petitioner argues that this omission warrants federal habeas relief, his claim fails. See Henderson v. Kibbe, 431 U.S. 145, 156-57 (1977) ("[W]e reject the suggestion that the omission of more complete instructions on the causation issue 'so infected the entire trial that the resulting conviction violated due process.'")

At the outset, errors of state law do not necessarily qualify as a denial of due process. Swarthout v. Cooke, 562 U.S. 216, 222 (2011) (citations omitted). To establish a due process claim on the basis of the trial court's failure to define "attempt", Petitioner would have to show that "both the instruction was

ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 190 (2009). "[T]he inquiry requires careful consideration of each trial's unique facts, the narratives presented by the parties, the arguments counsel delivered to the jurors before they retired to deliberate, and the charge as a whole." Williams v. Beard, 637 F.3d 195, 223 (3d Cir. 2011) (citing Waddington).

Here, the trial judge's robbery instruction included the following: In this connection you are advised that an act is considered to be "in the course of committing a theft" if it occurs in an attempt to commit the theft, during the commission of the theft itself, or in an immediate flight after the attempt or commission." (ECF No. 8-10 at 63.) The trial court additionally provided: "It does not have to be a completed act where actual receipt of what sought to be robbed is made by the defendant." (Id. at 65.) The evidence at Petitioner's trial, which included eyewitness testimony and testimony from Petitioner's associates who were aware of his intention to rob and his actually robbing and shooting Williams, supported the robbery conviction. "As there was sufficient evidence before the jury to meet the State's burden on each element of the robbery charge, and they were properly instructed as to the State's burden of proof, Petitioner, has not

shown that the instructions as given so tainted his trial that he was deprived of due process." Williams v. D'Ilio, No. 15-1720, 2016 WL 1436272 *7 (D.N.J. Apr. 11, 2016) (held that supposed incomplete robbery instruction due to trial court's failure to provide "attempt" instruction despite the unsuccessful theft did not warrant federal habeas relief because the trial court unambiguously instructed the jury of the state's obligation to prove every element).

In light of the foregoing, the Court denies Petitioner's request for relief on this claim.

C.  Prosecutorial Misconduct

Next, Petitioner alleges three occurrences of prosecutorial misconduct during the course of the trial.

When addressing claims of prosecutorial misconduct, "[a] reviewing court must "examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant" to determine if prosecutorial conduct rises to a level that infects the trial with such unfairness as to make the resulting conviction a denial of due process. Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

1. Prosecutorial Misconduct During Opening

Petitioner asserts that the prosecutor's opening statement which included that he would produce eyewitness Vaughn Blakely as a

witness despite his eventual failure to do so was misconduct. (ECF No. 3 at 24-27.)  Petitioner first raised this claim in his direct appeal's pro se supplemental brief.  (ECF No. 8-22 at 5-17.)  The Appellate Division affirmed Petitioner's conviction without addressing this particular claim.  Cornelius, 2007 WL 1687510.

At Petitioner's trial, the prosecutor's opening statement included comments about eyewitness Vaughn Blakely's role in the police investigation of this case.  (ECF No. 8-4 at 24.)  Defense counsel did not object to the prosecutor's mention of Blakely at trial.  More specifically, that Blakely helped the police link Petitioner to the multiple nicknames that eyewitnesses provided to the police.  (*Id.*)  Later in his opening statement, the prosecutor described Blakely and what his testimony would entail.

> The other detective, on the scene, a Detective
> Michael Graham was approached by a man on a
> bicycle, an individual by the name of Vaughn
> Blakely, and you'll hear from Vaughn Blakely
> later on in the trial and he's not someone
> that's my favorite witness.  The State doesn't
> get to choose and pick its witnesses.  Vaughn
> Blakely has a criminal history and you'll hear
> about that, but Vaughn Blakely rode up on the
> bike, rode up on the bike and talked to the
> detective and asked him what had happened to
> the young boy that had been shot.  And he told
> him that Bobby had died.  And Detective Graham
> then had Vaughn Blakely come back – accompany
> him to the major crimes headquarters and they
> interviewed him, and Vaughn Blakely told them
> about being there earlier in the evening and
> that he was there, he had conversation with
> Daniel Cornelius who displayed an [sic] a

handgun to him, it was a semi-automatic handgun. According to Blakely it was a Bracco (ph) model number, (sic), he mentioned nine millimeter, and he knew that because he had at one point in time a gun similar to that.

In any case, Vaughn Blakely at the time said that Daniel Cornelius asked him if wanted to commit a robbery with him. The police didn't take a taped statement from Vaughn Blakely at that time because they knew he was high on something, they could tell by his demeanor. At a subsequent time, a couple of days afterwards, on the 25th of September, they did take a taped statement from him in which he tells him the same things, basically that he told him earlier in that interview, but now they know that it is Daniel Cornelius. They have a name.

(Id. at 30-31.)

The Supreme Court addressed supposed prejudicial comments such as those at issue here and held that the trial judge's jury instruction to not consider the attorneys' remarks as evidence was sufficient. Frazier v. Cupp, 394 U.S. 731, 735-37 (1969) (In his opening arguments, prosecutor summarized expected testimony of witness who eventually invoked the Fifth Amendment on the stand and as a consequence did not provide any of the expected testimony). The Supreme Court reasoned "[m]any things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance." Id. at 736.

Here, the prosecutor's opening statements did not overemphasize Blakely's expected testimony. Rather, Blakely's expected testimony was referenced in a string of references to expected

eyewitness testimony, including that of Yakita Foreman, Ronald Harris and Latel Allen. (ECF No. 8-4 at 27, 31.) Moreover, notwithstanding the prosecutor's obvious disdain for Blakely or his criminal history, given Blakely's history of cooperation in the investigation, the prosecutor had no obvious reason to expect Blakely's absence from trial. See Daniels v. Ortiz, No. 05-1924, 2006 WL 2465416 at *7 (D.N.J. Aug. 22, 2006) ("[W]e cannot conclude from the record before us that the prosecutor did not have a good faith belief that he would produce [the witness] to present testimony . . . "). Finally, the record reflects that the trial court instructed the jury twice that the attorneys' comments were not evidence. (ECF No. 8-10 at 47, 49-50.) See Weeks v. Angelone, 528 U.S. 225, 234 (2000)("A jury is presumed to follow its instructions."). In short, it is not evident that the prosecutor's opening statement previewing but not emphasizing expected testimony of Blakely, revealing Blakely's criminal history and his intoxication at the time of allegedly observing the crime, where Blakely was not eventually called as a trial witness and the jury was twice instructed that counsel's remarks are not to be considered as evidence by the jury, offended petitioner's right to confront the prosecution's evidence arising to prosecutorial misconduct.

Therefore, the Appellate Division's decision not to reverse on this ground is not contrary to clearly established federal law.

## 2. Prosecutorial Misconduct During Summation

Petitioner asserts that the prosecutor's improper comments on summation were in violation of his Constitutional right to due process and a fair trial. Petitioner bases this claim on the prosecutor's closing arguments where he urged the jury "to rely on their own common sense and not adopt the approach suggested by lawyers." (ECF No. 3-16). Petitioner characterized this statement by the prosecutor as a means to "denigrat[e]" his trial counsel. (Id.)

Petitioner first raised this claim on direct appeal and the Appellate Division found that the prosecutor's statements were not of a nature that warranted reversal. Cornelius, 2007 WL 1687510 at *4.

"Improper statements made during summation may warrant a new trial when such statements 'cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" United States v. Brown, 765 F.3d 278, 296 (3d Cir. 2014) (citation omitted). When evaluating whether a prosecutor's remarks rise to the level of a constitutional violation, "Supreme Court precedent requires the reviewing court to weigh the prosecutor's conduct, the effect of the curative instructions and the strength of the evidence." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001) (citations omitted).

Here, the Appellate Division concluded that the prosecutor's comments were not egregious and that they did not deny Petitioner a fair trial. The state court's application of established federal law was not unreasonable. The comments at issue were not an attack on defense counsel but rather a plea for the jury to apply their own sense when considering the facts of the case. Assuming arguendo that the comments were directed at defense counsel, the Third Circuit has articulated a distinction between attacking counsel's strategy and attacking counsel by making arguments that are not supported by the record. See United States v. Rivas, 493 F.3d 131, 139-40 (3d Cir. 2007) ("[T]he prohibition against personal attacks on attorneys is rooted less in a sense of decorum than in the same rule underlying the prohibition on vouching; one cannot make arguments unsupported by the record evidence.") For these reasons, the prosecutor's comments did not amount to misconduct and habeas relief is not warranted on this ground.

3. <u>Prosecutorial Misconduct for Calling an Uncooperative Witness</u>

Finally, Petitioner's last claim of prosecutorial misconduct involves the prosecutor calling an uncooperative witness to the stand during the state's case in chief. At trial, the state called Abdul Muhammad, despite him voicing his reluctance to testify mere moments before he was called to the stand. (ECF No. 8-7 at 59.) Muhammad invoked the Fifth Amendment at the start of the

prosecutor's line of questioning in the jury's presence. (Id.)
During a bench conference, the prosecutor informed the court that
he did not know that Muhammad would invoke the Fifth Amendment.
(Id. at 60.) Muhammad was eventually impeached using his prior
statements after the trial court held a Rule 104[2] hearing and ruled
that Muhammad was feigning an inability to recall. (Id. at 65.)
Nonetheless, Petitioner argues that the prosecutor knew that
Muhammad was going to invoke the Fifth Amendment, thereby having
a prejudicial effect on the jury. (ECF No. 8-3 at 31.) Petitioner
raised this claim on direct appeal in a pro se supplemental brief.
(ECF No. 8-22 at 18-22.) The Appellate Division affirmed
Petitioner's conviction without addressing this particular claim.
Cornelius, 2007 WL 1687510.

Prosecutorial misconduct may arise when the state calls a
witness in a "conscious and flagrant attempt to build its case out
of inferences arising from use of the testimonial privilege."
Namet v. United States, 373 U.S. 179, 196 (1963). However, here
the record does not support Petitioner's argument that the
prosecutor called Muhammad to the stand knowing that he would
invoke a privilege that he did not have a legal basis to assert.

---

[2] A Rule 104 hearing, like its federal counterpart in Fed. R. Ev.
104, is a hearing outside the presence of the jury so that the
trial judge may determine issues such as existence of privilege,
qualification of a witness or admissibility of evidence.
N.J.R.E. 104.

The prosecutor learned from the courtroom deputies in the moments leading up to calling Muhammad that he was in a holding area protesting his being called as a witness. (ECF No. 8-7 at 59.) At the Rule 104 hearing, the prosecutor elicited from Muhammad that he met with investigators just days prior, to review his previous statements. (Id. at 62-65.) There was no indication during that meeting that Muhammad planned to assert any testimonial privilege or become a hostile witness for that matter. In fact, Muhammad admitted that he hugged one of the detectives at the end of their meeting. (Id. at 64.)

The Supreme Court, in Namet, provided a second factor when assessing claims of prosecutorial misconduct, by looking to see whether "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." Namet, 373 U.S. at 187. Once again, despite Muhammad invoking the Fifth Amendment before the jury, he eventually did testify about the events he described to law enforcement shortly after Williams' murder. Even if Petitioner's claim that the prosecutor was aware of Muhammad's intention to invoke the Fifth Amendment was true, the significant non-privileged testimony that he provided was not out-weighted by his initial refusal to answer. In light of this, the Appellate Division's decision to affirm Petitioner's conviction was not contrary to clearly established federal law.

The prosecutor's conduct when calling Muhammad to the stand, did not amount to a violation of Petitioner's constitutional rights and, as such, relief is denied with respect to this claim.

    D.    Ineffective Assistance of Counsel

Petitioner next makes a series of ineffective assistance of counsel claims with respect to his trial, appellate and PCR counsel.

The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. Second, the defendant must show that he was prejudiced by the deficient performance. Id. This requires showing that counsel's errors deprived the defendant of a fair trial. Id.

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." Id. at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to escape

31

what the Strickland court referred to as the "distorting effects of hindsight." Id. The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. Kimmelman v. Morrison, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below Strickland's standard." Grant v. Lockett, 709 F.3d 224, 232 (3d Cir. 2013) (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the Strickland standard itself." Id. Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." Id. (quoting Cullen v. Pinholster, 131 S. Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under Strickland, "through the deferential lens of § 2254(d)." Id. (internal quotation marks and citations omitted). "With respect to the sequence of the two prongs, the Strickland Court held that 'a court need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" Rainey v. Varner, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting Strickland, 466 U.S. at 697)).

Ineffective assistance of appellate counsel is analyzed under the Strickland standard as well. See Albrecht v. Horn, 485 F.3d 103, 137 (3d Cir. 2007) (quoting United States v. Mannino, 212 F.3d 835, 840 n.4 (3d Cir. 2000)). The two-part Strickland test requires this court to first determine whether counsel's performance was deficient, which in the context of an appeal requires evaluation of counsel's failure to raise proper issues on appeal. See Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) ('[I]t is a well established principle that counsel decides which issues to pursue on appeal.") Secondly, Petitioner must show that but for his counsel's failure to raise the omitted issue, he would have prevailed on his appeal. Pichardo v. Nelson, No. 13-6930, 2015 WL 9412918 at *11 (D.N.J. Dec. 22, 2015) (quoting Smith v. Robbins, 528 U.S. 259, 285 (2000)). The seven grounds are grouped for analysis into the following four subparts.

1. Ineffective Assistance of Trial Counsel for Failure to Fully Investigate the Case, Particularly Issues with Witness Identifications.

Petitioner alleges that he was denied his Sixth Amendment right to counsel due to trial counsel's failure to adequately investigate the case, particularly the eyewitness identifications that led to Petitioner's being named a suspect in Williams' murder. (ECF No. 3 at 42.) Although Petitioner does not provide any supporting facts or arguments in the instant petition, he directs the Court's attention to his PCR petition where he initially raised this claim. Respondents correctly argue that Petitioner has not fully exhausted this claim, as he did not appeal the PCR Court's denial to the Appellate Division. (ECF. No. 8 at 36-37.) Nonetheless, this Court will address this unexhausted claim on the merits, 28 U.S.C. § 2254(b)(2).

Petitioner now claims as he did in his PCR proceeding, that trial counsel failed to adequately investigate the case and properly attack the state's unreliable witness identifications. (ECF No. 8-30 at 5-7.) The PCR Court dismissed the claim without conducting an evidentiary hearing. (ECF No. 8-13 at 15-16.) Moreover, it noted that counsel's performance indicated that he pursued the most plausible strategy, which was that of misidentification, but eventually failed to convince the jury of Petitioner's innocence due to the overwhelming evidence against him. (Id.)

At his trial, Petitioner's theory of defense was that of misidentification. Therefore, trial counsel's strategy of

impeaching the state's eyewitnesses with prior inconsistent statements and their individual ability to perceive what occurred on the day of the shooting, was in line with this theory of defense. Trial counsel attempted to raise doubt during his cross-examination of a few witnesses in particular, Yakita Foreman, Latel Allen and Abdul Muhammad. With respect to Foreman, trial counsel elicited that Foreman did not like someone named "Shorty" who was later identified as the Petitioner. (ECF No. 8-5 at 9.) Moreover, trial counsel elicited Foreman's inconsistent statements about her ability to see the suspect's entire face, her estimation of the suspect's height and the shape of his eyes. (ECF No. 8-4 at 72-74.)

Trial counsel also used eyewitness Todd Dorn's testimony to attempt to undermine Latel Allen's testimony that he was at the scene at the time of the shooting. (ECF No. 8-6 at 17-19.) Trial counsel used Dorn to corroborate that Allen usually attended bible study at around the time that Williams' shooting occurred. Further, trial counsel insinuated Keith Bell had a motive to fabricate a story that Petitioner was the shooter so that Bell could obtain a favorable resolution of his own then-pending criminal case. (ECF. No. 8-7 at 50-51.) Finally, eyewitness Abdul Muhammad's own admission that he was a regular heroin user at the time of the shooting and the police investigator's observations that Muhammad was under the influence when he first approached him

immediately following the shooting, were used by trial counsel to undermine Muhammad's statements. (ECF No. 8-8 at 15.)

After a review of trial counsel's performance, this Court does not find that his performance was deficient or prejudicial to Petitioner. Strickland, 466 U.S. at 687. The record reflects that trial counsel familiarized himself with the eyewitnesses' prior statements as well as any bias or motive to lie that each of them potentially had. Moreover, trial counsel was effective at impeaching two very young state witnesses without appearing antagonizing. Petitioner has not identified what more trial counsel could have done to strengthen his defense strategy. "Where a 'petition contains no factual matter regarding Strickland's prejudice prong, and [only provides] . . . unadorned legal conclusion[s]. . . without supporting factual allegations,' that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief." Judge v. United States, 119 F. Supp. 3d 270, 281 (D.N.J. 2015) (quoting Palmer v. Hendricks, 592 F.3d 386, 395 (3d Cir. 2010)).

For the foregoing reasons, Petitioner is not entitled to federal habeas relief on this claim.

> 2. Ineffective Assistance of Trial Counsel for Failure to Object to State Witnesses Appearing in Prison Garb and Shackles; and Ineffective Assistance of Appellate Counsel for Failure to Raise this Claim on Appeal.

Petitioner alleges that he was deprived of his Sixth Amendment right to counsel due to his trial counsel's failure to object to state witnesses Keith Bell and Abdul Muhammad testifying in prison garb and shackles. (ECF No. 3 at 22-23.) He further contends that appellate counsel's failure to raise this issue on direct appeal further violated his right to effective assistance. (Id. at 22.)

Petitioner first raised this ineffectiveness claim before the PCR Court. (ECF No. 8-29 at 2.) The PCR Court summarily denied Petitioner's Petition and the Appellate Division affirmed without commenting on this particular claim. State v. Cornelius, Indictment No. 01-12-2508, 2013 WL 2169666 (N.J. Super. Ct. App. Div. May 15, 2013).

In the instant petition, Petitioner relies solely on the New Jersey Supreme Court's opinion in State v. Artwell, 832 A.2d 295 (N.J. 2003), in which they held that defense witnesses could not be compelled to testify in prison garb and restraints. He argues that his trial counsel's failure to object on the basis of Artwell was ineffective assistance.

Respondents correctly distinguish Artwell from the facts of Petitioner's claim and argue that even if the Appellate Division did misapply state law, Petitioner has not raised a valid constitutional claim. (ECF No. 8 at 25.) Nonetheless, as the PCR Court pointed out, the New Jersey Supreme Court did not rule that

witnesses for both the state and defense should testify in civilian clothing until close to five years after Petitioner's trial, in its decision in State v. Kuchera, 198 N.J. 482 (2009). (ECF No. 8-13 at 22.)

There is no Supreme Court precedent that supports Petitioner's claim. The closest the Supreme Court has come to addressing the matter was with respect to a defendant's choice to wear non prison-issued attire and visible restraints. See Estelle v. Williams, 425 U.S. 501 (1976); see also Deck v. Missouri, 544 U.S. 622 (2005). However, this right has never extended to prosecution or defense witnesses. Thompson v. Warren, No. 11-7164, 2014 WL 3778738 at *5 (D.N.J. July 31, 2014)("[N]o extension of the Estelle v. Williams holding to witnesses could be warranted, since the principal interest protected by the Due Process Clause is the presumption of innocence accorded to criminal defendants: a concern wholly inapplicable to even defense witnesses.") (citations omitted)).

Petitioner cannot justify his argument that he was prejudiced by trial counsel's performance for not objecting to the state witnesses' attire. These witnesses, who were not co-defendants of Petitioner nor implicated in commission of the charged crimes, testified for the state, not the defendant, and their garb, if prejudicial to anyone, would tend to cut against the party who called them. Neither can his appellate counsel's performance be

deemed ineffective for not raising unmeritorious claims on direct appeal.  See Jones v. Barnes, 463 U.S. 745, 751-55 (1983).  For the foregoing reasons, Petitioner's request for relief pursuant to this claim is denied.

3. Ineffective Assistance of Trial Counsel for Failure to Enforce the Plea Agreement; and Ineffective Assistance of Appellate Counsel for Failure to Raise the Issue on Direct Appeal.

Petitioner next argues that his trial counsel's failure to enforce the plea agreement was ineffective.  (ECF No. 8-3 at 32-36.)  Moreover, he argues that appellate counsel's failure to raise this issue on direct appeal was duly ineffective.  Petitioner unsuccessfully raised this claim in his PCR petition.  The PCR Court determined that based on the scant record of plea agreement negotiations and no record whatsoever of the prosecution executing the plea agreement, trial counsel could not be deemed ineffective for not addressing the issue before the trial court.  (ECF No. 8-13 at 19-21.)

"[P]lea agreements, although arising in the criminal context, are analyzed under contract law standards."  United States v. Williams, 510 F.3d 416, 422 (3d Cir. 2007) (quoting United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998)).  "Unless required by the Statute of Frauds, *N.J.S.A.* 25:1-5 to -16, or as otherwise provided by law, contracts do not need to be in writing to be enforceable.  When one party, however, presents a contract

for signature to another party, the omission of that other party's signature is a significant factor in determining whether the two parties mutually have reached an agreement." Leodori v. CIGNA Corp., 814 A.2d 1098, 1106 (N.J. 2003).

Petitioner's only evidence is his own uncorroborated assertion that he entered a factual basis on the record, in the presence of the judge and prosecutor. (ECF No. 8-3 at 32-34.) While he maintains that he signed the plea agreement form on the date of the supposed plea hearing, he does not claim to have ever witnessed the prosecutor execute the form. The plea agreement form dated March 8, 2004, only contains signatures from Petitioner and his trial counsel. (ECF No. 8-35 at 23-25.) Petitioner's PCR counsel informed the PCR Court that it was his understanding that the parties discussed a plea agreement that would require the Petitioner to serve a twenty-year sentence subject to the No Early Release Act. Moreover, counsel informed the PCR Court that although the prosecutor provided the defense with a plea agreement form, he indicated that he needed to confer with the victim's family about the plea bargain. (ECF No. 8-13 at 3-4.) Nonetheless, Petitioner insists that the prosecution reneged on a valid plea agreement after the victim's family objected to the plea terms.

This Court does not agree with Petitioner's argument that a plea agreement existed. While Petitioner appeared interested in the

plea bargain, the state eventually reconsidered its offer, due in large part to the victim's family's objection. This is supported by the non-existence of a plea agreement executed by all of the parties. As Respondent points out, the parties have not located a transcript of the supposed factual proffer that was placed on the record on March 8, 2014, or March 9, 2014. (ECF No. 8 at 30.) They further submit that the court docket from that day indicates that the hearing scheduled for that date was adjourned for a later date. Petitioner's argument that the parties reached a meeting of the minds and the state's rescission was a breach of that contract, fails. "[A] party's signature to an agreement is the customary and perhaps surest indication of assent." Leodori, 814 A.2d at 1107. The record simply contains no evidence of verbal or written assent by the prosecutor.

Here, the Court agrees that Petitioner cannot show that he was prejudiced in light of the fact that the claim was not viable. As the PCR Court pointed out, appellate counsel presumably did not pursue the unmeritorious claim for the same reason that trial counsel failed to raise the issue before the trial court. As such, Petitioner fails to show that the state court unreasonably applied Strickland or that the denial of this claim was the result of an unreasonable determination of the facts. The Court will therefore deny habeas relief on this ground.

4. Ineffective Assistance of Appellate Counsel for Failure to Raise the Trial Court's Denial of Petitioner's Wade Hearing Motion; and Ineffective Assistance of PCR Counsel for Failure to Raise Appellate Counsel's Ineffectiveness on Direct Appeal.

Finally, the Court will address Petitioner's claim that appellate counsel failed to raise the trial court's denial of his Wade[3] hearing motion in Petitioner's direct appeal. In the instant petition, Petitioner does not raise any factual or legal arguments but cites his trial counsel's oral arguments from his application for a Wade hearing. Nonetheless, this Court construes Petitioner's arguments as an ineffective assistance of counsel claim for failure of both appellate and PCR counsel to raise the trial court's denial of an evidentiary hearing to determine the admissibility of testimony from eyewitnesses that would violate the Due Process Clause's protection against certain suggestive identification procedures. Petitioner's trial counsel filed a motion for a Wade hearing on the basis of suggestive identification procedures. The trial court reviewed the parties' written submissions and considered oral arguments before denying Petitioner's motion. (ECF No. 8-4 at 3-16.)

"An impermissibly suggestive identification procedure can occur in four settings: a show-up, a photo array, a line-up and in court." United States v. Brownlee, 454 F.3d 131, 137 (3d Cir.

---

[3] United States v. Wade, 388 U.S. 218 (1967).

2006).  The United States Supreme Court articulated the standard
for impermissible suggestiveness in Neil v. Biggers, 409 U.S. 188,
196-97 (1972).  There the Court held that convictions based on
eye-witness identification . . . will be set aside only if the
photographic identification was so impermissibly suggestive as to
give rise to a very substantial likelihood of . . .
misidentification.  Id.  The Court in Biggers also articulated
that a "totality of the circumstances" included the witness's
initial opportunity to view the suspect at the crime scene and
degree of attention at that time, the witness's level of certainty
in the disputed identification, the length of time between initial
viewing and disputed identification, and the accuracy of any
intervening description of the suspect occurring between those two
events.  Id. at 199-200.

The legal framework for analyzing the reliability of eyewitness
identifications is the two-part Manson/Madison test.  See Manson
v. Brathwaite, 432 U.S. 98 (1997); State v. Madison, 536 A.2d 254
(N.J. 1988).  The first step in this test requires courts to
determine whether the police identification procedures were
impermissibly suggestive.  If the first prong is met, the court
then weighs the five reliability factors to decide if the
identification is admissible.  See Manson, 432 U.S. at 114;
Madison, 536 A.2d at 258-59.

The trial court concluded that Petitioner had not made a prima facie showing that the identification procedures were suggestive:

> So thus determination of whether or not an identification by an eyewitness was reliable should be based on the totality of the circumstances and consider the following factors: One, the opportunity of the witness to view the criminal at the time of the crime. Two, the witness's degree of attention. Three, the accuracy of the witness's prior description of the criminal. Four, the level of certainty demonstrated at the time of confrontation. Certainly past knowledge of the defendant or the suspect of the defendant by a witness plays a huge role in that factor. And five, the time between the crime and the confrontation, that's <u>State vs. Cherry</u>, 289 N.J. Super, at page 520 and that follows <u>Ortiz</u> really.
>
> So let's take a look at the three procedures that are being challenged by the defense in this case. The first I'm going to look at is Latel Allen. Latel Allen as indicated is a ten year old boy at the time. He indicates that he saw the defendant who he knew as Blue, not as Daniel Cornelius but as Blue. He saw the defendant in a home immediately preceding the shooting and then was playing near where the shooting occurred. Prior to the shooting Latel when to a friend Roger's house at 409B North Carolina and he indicated Blue, Ms. Jewel some man and Roger's mom were the people in the house. Latel indicated he had known Blue for a year and that he knew him as Rogers [sic] uncle. Latel heard Blue say to an identified man that quote, he going to get that sucker, end quote, believing to be referring to Robert Williams. Latel indicated Blue was wearing all black clothing and boots in the apartment. About a half hour later Latel went outside to play tag, and he heard Blue say "come here" to a man, and the man said "what you want"? Latel then went over to the other side of the playground, a gunshot

went off. Latel said he knew it was Blue
because he saw part of his face. Latel said
Blue had a scarf covering part of his face.
Latel after giving all that information to the
police was shown six photographs. And I find
at this point in time based upon what is
presented to me, that the attorney general's
guidelines with regard to out-of-court arrays,
the showing of photos was complied with in
this case in all three of these out-of-court
photo arrays. Latel was show six photographs.
When the third picture was shown, he said, He
is the guy that did it, apparently not just
that this was Blue, but that this was the guy
who had done it. Latel was then shown the
rest of the pictures. Was asked to write his
name on the picture that he identified and
write his initials on the other photos.

Interestingly the matter's presented to me
today by Mr. Shenkus who himself indicates it
took him several views of this photographic
array to even realize that Mr. Allen here—not
Mr. Allen—Mr. Cornelius here has on what
appears to be a darker colored sweater. The
other gentlemen have what appear to be light
colored sweaters or sweat shirts or even a
shirt, although it is pointed out by
Prosecutor Co[n]stantini that one of these
gentleman [sic] has a dark colored sweatshirt
under a lighter colored over-shirt.

The fact is, and it cannot be denied that Mr.
Allen indicated, young person that he is, that
he knew this individual and had known him for
sometime and [k]new him in kind of a casual
acquaintance as being a relative of this
fellow Roger. He was Roger's uncle.

If anything, I guess you could argue there's
some subliminal message here with regard to
one person wearing black, another person
wearing black under another shirt and the
other individuals wearing white. But when you
consider the totality of the circumstances and
you consider that Latel Allen was familiar
with Blue prior to this, I look at these photos

as being in my estimation individuals who look remarkably similar characteristic-wise to one another. They all are African American men who even seem to have very similar skin tone, albeit in black and white photos; they all have some facial hair way regard to a light mustache; some of them have a light to have [sic] heavier growth underneath, almost like a goatee, but these men all appear to be about the same age, they all appear to have a very similar look to them, they all appear to have a very similar appearance. I can't recall myself being here six years and doing defense and prosecution work for more years than I'm going to admit before then, seeing six more similar photographs in my life, in my career than were an assembled by the police in this case. So, for me to find that there's any suggestiveness whatsoever particularly since the guidelines were complied with, and simply because the one individual has what appears to be a darker colored T-shirt. We don't know if it is black. And Mr. Cornelius—I keep wanting to go call him Mr. Allen—has what appears to be a darker colored sweater under these totality of circumstances is clearly not suggestive. I can't in any good conscious or in exercising my discretion find that these photographs notwithstanding the argument raised and a rather clever argument I will admit, the argument raised by the defense has any bearing here or any justification for a Wade hearing under the prevailing case law.

Similarly, Ronald Harris is not shown in these same photographs. There was some issue made by the defense as to whether he went through the photographs twice. Well, if he did, he did, but that doesn't mean that there is any hint or evidence of any suggestiveness to it. Even if I accept the defense version of the incident as revealed as they read the discovery, it would appear that, he first goes through the photos, indicates the shooter is in there, and then is asked to identify the shooter and picks out the photograph of Mr.

Cornelius. Again, under the totality of the circumstances a person whom he knew.

I believe in Harris's situation – I'm trying to recall exactly how he knew him or how long he knew him – knew him for about a year. There is a significant level of certainty that is made by both of these individuals, albeit one who is only ten years of age. As far as the time between the incident and the out-of-court array, the defense has acknowledged that with Harris it was within 24 hours, and with Latel Allen I believe it with was within three days, because I think he made the out-of-court photo I.D. on the 25th and the shooting was allegedly on September 22nd.

Finally with regard to Yakita Foreman, I find that even though she did not know the shooter in advance to be a similarly weak argument. And there appears to be no evidence whatsoever of any suggestiveness whatsoever in the out-of-court identification process. So I can't even get to the second stage of determining whether or not taking all factors into account and even if the identification procedure was suggestive, whether there's any likelihood of misidentification or whether the identification is at all reliable. I can't even get to that question cause I don't find any threshold challenge made whatsoever to suggest to me that the out-of-court procedures and identification procedures were suggestive in any way, shape or form in this case. So I have to respectfully deny the application for a full blown Wade hearing to the defense.

(ECF No. 8-4 at 13-16.)

The last reasoned state court decision reflects that the court conducted a thorough analysis of all of Petitioner's claims before denying the motion for a Wade hearing.

47

In denying the petition, the trial court addressed Petitioner's arguments that the photographs used in the photographic arrays were suggestive because Petitioner's was the only one that included an individual wearing a black shirt. Petitioner's argument then as well as now is that this was unduly suggestive because all of the eyewitnesses indicated that the suspect was wearing a black shirt. The trial court found that the actual photograph and the police's identification procedure was not improper. The trial court also opined that despite Petitioner being the only one in a darker shirt in the photographic array, all of the photographs were of men with similar complexions, facial hair, age and overall appearance. Additionally, Petitioner argued then as well as now, that both Ronald Harris and Yakita Foreman asked to view the photographs twice before identifying Petitioner as the assailant. (ECF No. 8-3 at 38-41.)

Notwithstanding this, Ronald Harris's testimony indicated that he was previously acquainted with the Petitioner, although he only knew him by a nickname. Moreover, as for Foreman's request to look at Petitioner's photograph again, this did not constitute unnecessary suggestiveness. For one, the record reflects that Foreman, who was with the victim at the time of the shooting, had an opportunity to observe the Petitioner, albeit with a bandana on his face, as he robbed and shot the victim. However, Petitioner then returned to the shooting location, this time with more of his

face exposed, allowing Foreman to further observe him. As such, the trial court concluded that Petitioner failed to demonstrate sufficient suggestiveness to question the reliability of the identifications.

Nonetheless, trial counsel made several competent arguments about the reliability of the witness identifications to the jury. Manson, 432 U.S. at 116. ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill.") Petitioner has not satisfied either prong of Strickland as noted above. In light of this record, appellate counsel cannot be deemed ineffective for not challenging the trial court's evidentiary ruling. See Werts v. Vaughn, 228 F.3d 178, 202 (3d Cir. 2000). Petitioner is denied relief on this ground.

Lastly, with respect to Petitioner's ineffective assistance of PCR counsel claim, Section 2254 precludes this type of claim in a federal collateral post-conviction proceeding. See Martinez v. Ryan, 132 S.Ct. 1309, 1320 (2012) (while ineffective assistance on initial collateral review proceedings may be grounds for excusing procedural default, it is not the basis for an independent constitutional claim). Therefore, the Court will deny this claim.

Accordingly, all of Petitioner's claims of ineffective assistance of trial/appellate/PCR counsel are denied.

## V. CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied.

## VI. CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. See Third Circuit Local Appellate Rule 22.1. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right, and this Court will not issue a certificate of appealability.

An appropriate order follows.


**April 30, 2018**_____          **s/ Jerome B. Simandle**_____
Date                               JEROME B. SIMANDLE
                                   U.S. District Judge